May it please the Court, I'm Peter Eliasberg from the ACLU of Southern California. For the plaintiffs, two of whom are with me here today, Mr. Kerr and Mr. Cody, and I'm here along with my co-counsel, Brenda Wright, from the National Voting Rights Institute. The principal issue in this appeal is whether the First Amendment prohibits restrictions on speech and association concerning presidential elections over the Internet where no money or items of tangible monetary value are exchanged, but instead there are merely the promises of mutual political benefit. The conclusion that flows from Brown v. Hartledge and the campaign contribution limits cases is that the government's application of the California Elections Code to the websites it issued and the strategic voting agreements that they facilitated is impermissible because, in fact, they do not involve any promises to exchange money or other items of tangible financial worth. And what Brown also says, before we get too far out in the stratosphere here, we begin our analysis of the statute at issue, which was a voter corruption statute, acknowledging that the states have a legitimate interest in preserving the integrity of their electoral processes. Just as a state may take steps to ensure that its governing political institutions and officials properly discharge public responsibilities and maintain public trust and confidence, a state has a legitimate interest in upholding the integrity of the electoral process itself. Of course, it then goes on to say, but when a state seeks to uphold that interest by restricting speech, the limitations on state authority imposed by the First Amendment are manifestly implicated. Now, this is a fascinating case because it's clear that the heart of the political process is at stake, and yet the state is saying, wait a minute, this is a boat-swapping manipulation of the electoral process, and we ought to have some ability to step in and deal with it. So let's acknowledge up front that it's not a slam-dunk case, that there's absolutely no interest on the state side. How do we reconcile it? So as you argue, be passionate, but let's recognize that there is some state interest here in a fair political process. Your Honor, I absolutely recognize, and it would be foolish for me to argue to the contrary, that the state does not have an important, indeed compelling, interest in preserving the integrity of the political process. The question here is what kind of arrangements have the courts allowed to be prohibited in order for the state to satisfy that interest? And what I believe the line that flows from these cases is, on the one hand, where there is money involved, where there is the raw exchange of dollars for votes, or the raw exchange of the idea that we are trying to buy legislation through excessive contributions, the government has every right to step in, in order to satisfy its interest in prohibiting or protecting against corruption of the political process. But there is no interest. Kennedy says, I'll get you a job, or I'll get your brother out of prison. Your Honor, my dichotomy is money or other tangible items of financial worth on the one hand. Well, getting your brother out of prison, that's not tangible financial item. It's specific, but it's not financial. But the other half of the dichotomy is mutual promises of political benefit, benefits that flow through the political process. So you accept the proposition that it doesn't have to be financial, necessarily, that getting your brother out of prison is something you couldn't promise to get a vote? I accept that, Your Honor. That's correct. And it's not an accident I used that example, but it does move away from financial. It means if it isn't just a financial benefit, but a benefit, isn't there a benefit if you can say to somebody, look, participate in this swap, and you'll get the electoral results you'll be happier with down the road? Yes, but it's a mutual political benefit in the same way that the kind of promise that a union makes to a candidate will support you if you promise to support legislation, for example, changing Taft-Hartley or supporting minimum wage rises, that are the lifeblood of the political process. And what's involved there are the mutual political benefits that are similar to the individual mutual political benefits that are involved here. We're not going outside the political process to say, I'd like to line my pockets with $5 or $100 or a job or get my brother out of jail. I'm from Chicago, so I know about that part. Better than I, Your Honor, I'm sure, although I think it may exist everywhere. But my point really here is that there is a distinct difference between that item of what is outside the political process versus the mutual political benefit, because if you take the government's position to its logical extreme, why can't you prohibit the union from saying to the candidate, we'll support you if you promise to support the repeal of Taft-Hartley? Why can't you? Well, let's take one that's more immediate to this case. You say there's a mutual promise, but then you make a big point of saying, but it's not an enforceable promise. Okay? Voters in California are being exposed to a mechanism on the Internet, a new, I mean, it probably theoretically probably existed through mails or everything else. But of entering into a transaction, thanks to your clients, of agreeing to not vote what they really want to vote, that is, in this case, I will vote for Nader here in California, although I really want to vote for Gore. If you will agree in another state to vote for Gore instead of Nader, that will tip, we understand the mechanics and the intent of the arrangement. But in fact, what's going on in the transaction, it turns out, is that I, as the good faith California voter, am being conned by the evil Bush organization. I'm only saying that because we're talking about the 2000 election, and we won't go totally hypothetical, and they aren't evil. But let's suppose, for the purposes of the hypothetical, that some group of pro-Bush voters decide, hey, this is cute. What we can do is induce these gullible California voters to agree to vote for Nader. And that's as far as the transaction, in fact, will go. So they have now been, in effect, defrauded. That is, the California voters have been defrauded. Now, would California have any ability to or interest in to prevent that kind of fraudulent arrangement? Gannon, I believe the government always has an interest in preventing fraud. But what the Schomburg case stands for is the proposition that we don't allow blanket restrictions on speech on the ground that some transaction may be fraudulent. Let's take this as an example of, again, using the Internet, but an area of speech where there's even a lower level of protection, commercial speech. We would never allow the government to say, oh, boy, if there are any financial transactions over the Internet, easily fraudulent, because you're not going to the you have the faith that somehow or other you'll get the product from eBay. We don't allow the government to say we're going to ban all e-commerce on the ground, that there could be some fraud. That would be absolutely impermissible. I don't think it's the First Amendment that gets in the way, and I'm not sure how the First Amendment would get in the way of that, frankly. Well, actually, commercial speech, Your Honor, is subject to a lower level of protection. But the sales transaction isn't speech. Well, it's an offer, but it would because there's an offer of that's what commercial speech doctrine is about, is the offer of the sale of an item. That's what commercial speech cases are about. But, Your Honor, fair enough, if I may. But I get back to a question that's relevant here, because the vote swap itself strikes me more as conduct than as speech. It may be expressive in some fashion, but I'm not sure it's very expressive. Why do we treat that as speech? Well, I respectfully disagree, Your Honor. I believe it is like a huge variety of other things that involve attempts to persuade people to vote a certain way and attempts to think yourself about what is the most strategic way to engage in your vote. There's no question you can pitch for votes, and, indeed, you can pitch for votes by going to California and say, vote this way because it's going to affect the election, and there will be people over there where it's not going to affect the election. You can vote differently, the scenario that Judge Fischer offered. Nobody could stop somebody from making that pitch. But to say, not that you're persuaded that it's the right thing to do, we're going to offer you a specific exchange, and then the last piece isn't simply speech. It's the exchange. Unless fraud is permitted because fraud is done through articulation, we don't deem fraud to be speech. And here, the exchange of votes isn't the speech. It isn't something going out in public because the vote is cast in private. It's inducing someone to vote not for the candidate of his or her choice, but for somebody else on the belief that it's going to be taken care of someplace else. Justice, I think your question actually has multiple questions. Multiple questions. It's a compound, if it were, on that. The core of it is really what makes it speech? What makes it speech as opposed to conduct? What makes it speech is that it is a discussion about and strategy about. Let's take it out of the concept of the Internet. Let's think about talking to your brother-in-law in another State and saying, I'm really struggling in this election, whether it's Gornader, whether it's Buchanan, Bush, or whatever. I'm really struggling, and I'm trying to figure out what the right way to cast my vote is. And you're struggling with this individually. When you take it into struggling with it somewhere, with someone else, that's political association, classic example thereof. And you start talking about what is the best thing to do, what are the consequences of my vote, what does this mean? And then when you enter this agreement, which Your Honor completely recognizes is nonverifiable, in the same way the promise in Brown v. Hartlidge is nonverifiable in the sense that will the candidate actually lower your taxes? We don't know until after the election. Will the person actually vote for the candidate based on the promise the candidate makes? None of those things are verifiable, but that's what Brown gets at. These promises, you do one thing, I'll do another. I, the union, will support you if you promise not to raise taxes. That's classic speech and association. That is not conduct. Kennedy. Well, we're talking about the mechanism, though, the mechanism, you know, the exchange of how it gets implemented, use of the mails and the like, how much of does not, as I understand it, in fact, when the Secretary of State shut down at least one of these websites or threatened one of these websites, they eliminated the transfer mechanism but left up the ability for people to exchange their views back and forth about whether or not this tactic was a good idea. Is that correct? It's not correct in the, I mean, I think I understand your factual predicate, but there is no transfer mechanism. What this does is allow you, it sets up a way for you to communicate with somebody else. It sets up a method of communication as opposed to the communication. But that's as if the government would say, well, we won't allow you to make the phone call to your brother-in-law in New York to discuss what's the significance of the vote and is there a strategic way that you and your brother-in-law can maximize your political influence. So I don't, I mean, Your Honor, respectfully, I think that's the How did the exchange get implemented if they agreed to do it? Just mechanically. What the websites did was if you said I have this particular vote, dilemma. You and I have agreed, you're in New Jersey, I'm in California. Well, but we haven't agreed. What the website does is We're up on the website. What the website would do is, I'm sorry, I didn't mean to cut you off. Go ahead, I just want to pause you, like, let's use real people and real examples. What the website would do is you've logged on and you say I'm having this dilemma. This is really driving me crazy because we make this choice all the time. Do we vote for our pure desire versus our And you say I'm struggling with this. And I, in another state, say I'm struggling with this. And what the website does is here are two people who are struggling with the same thing. Judge Fischer. It's a marriage broker. I get your e-mail address in California. You get my e-mail address. And they get that through the website. They get that through the website. And how is it that they are put in touch? It's their voluntary choice to decide whether they want to do that or not. How is it? What's the mechanism to exchange the e-mail? It simply sends an e-mail. Well, I'm on in a chat room and we're both in a chat room. Is that it? Not a chat room. What would happen is you would log on and then the site, if they found someone that they believed had a complementary interest, you would simply receive an e-mail. It's matching. It's like online dating, sort of. But, Your Honor, that doesn't make something conduct. I'm not – I'm just trying to understand how it works. Okay. But let me give you a real-life example. You're quasi-computer literate, and that's dangerous. You're way ahead of me. Emphasis on the quasi. But, Your Honors, probably you're aware that every political party and every 527 group in the last two elections has had a system where you can match yourself. You can get contact information for voters to do voter turnout. That's not conduct. The mere fact that there's a provision of information about somebody else who has a complementary political interest is not conduct. That's classic speech and association. I guess I'm having the same trouble over here trying to understand the exact mechanism of matching. If I go on and log on to this website, do then I check a box or click a particular spot and say, this is the way I feel, and then how does – how do I get connected to the other person? The black box of the website, I don't understand. But basically what will happen is, assuming that there is someone who has what I call complementary interest, you, Judge Martinez, will get an e-mail saying, so-and-so in X other state has expressed similar interest. Here is his e-mail address or her e-mail address, and you can contact that person by e-mail. And I similarly would get an e-mail saying, Judge Martinez, and here's his e-mail address, he's expressed complementary interest, and then we would contact each other. That's how the mechanism works. And both have consented to their e-mail address being made available to the other. That's exactly correct. Okay. Now, let's suppose that in addition to just matching up, the website takes a $10 service fee for that. Does that change the equation at all? I believe it enters – it brings into it the financial transaction that potentially makes this – would make this prohibitable. Okay. Now, admittedly, there wouldn't be – under the statute, I'm not sure that it would change anything, because it wouldn't be something that either the voter – either voter was receiving. But I think it's a lot more problematic. Okay. And let's suppose the quid pro quo was that one of the voters would have to agree to pay the other $10 for the vote. Absolutely prohibitable, Your Honor. We've never suggested to the contrary. All right. Now, you have argued the Dormant Commerce Clause. Okay. Now, what distinguishes in the Commerce Clause analysis what you just agreed could be prohibitable from what was done here? Well, under the First Amendment, the promise would be prohibitable. I think that the Dormant Commerce Clause doesn't allow that blatantly core voting transaction. I don't think we've ever said that commerce gets around a – I think you're saying that they can't do it because of the Commerce Clause. No, Your Honor. I'm not, because I don't think that the Dormant Commerce Clause has anything to say about the transaction about buying drugs over the Internet. The difference here is that what the Commerce Clause does, the website that Mr. Cody set up, VoteSwap, did not allow California users to use the site to be matched. They could go on the site, but they couldn't say, I want to receive matching information from another voter. So as a result, what that – what Mr. Jones' threat of prosecution did was take a website that had no effect in California, would allow somebody in Florida perhaps to be matched up with somebody in Ohio, in states even where the Secretary of State had flatly said, this is fine by us. Well, that may be – that's why I'm posing the hypothetical. Let's suppose, however, that California did do it because there was – you say it had no effect. What do you mean it had no effect in California? Because no California resident or voter would participate and use the website in order to be matched. Why? Because if it went on – if he went on and said, I'm from California, please provide me the address of somebody else, the site would say, we don't think it's a good idea. We think California doesn't fit as a swing State or clearly, you know, Bush State. Let's put the money back into it. Now there's an economic interest on the part of the website. The voter may not know that there's no value in it, but they decide they want to do it anyway. I'm just trying to understand, at what point does the Commerce Clause aid or not aid your case? The Commerce Clause aids our case – well, first of all, if there was the money exchanged between voters, that would be a violation of Federal law. As we put in the record, the Justice Department very clearly said that these websites were not any problem under Federal law whatsoever. No, I don't think the – at least Janet Reno, when the – as I read the transcript of her press availability, when asked directly about vote swapping, she said, we would be very cautious. And in a very cautious Reno-like answer, when asked again, said, well, let's suppose just the two of you exchange, and she said, we would be very cautious. Well, Your Honor, the Justice Department spokesman made a statement in the record that said these don't violate Federal law. Well, maybe Federal law, yeah. Federal law. Well, we're talking about State law here, and that's because the Federal law is specifically directed at monetary exchange. That's correct. But that's what the question to Reno was put, let's suppose there's no monetary exchange. That's when she said, as I recall from the record, that she would be very cautious. Well, Your Honor – But in any event – It doesn't – I don't want to invite – I don't want to invoke the Justice Department as the authority in this case, because I think it's – I'm not even sure it's a valid advisory opinion. The issue we have here to wrestle with – and I'm not saying these – there are any easy answers here trying to navigate through this – is at what point does the Dormant Commerce Clause in your analysis drop out of the picture, or does it basically – or – and to what extent does it prohibit what California is doing? Without going to other hypotheticals, in this situation with Voteswap.com, if a California resident had said, I would like to be matched, the site would say, we won't do it. So California residents were thrown out of participation in the matching portion of Voteswap.com. As a result, the threat of prosecution, closing down the website, had the effect only of prohibiting people from being matched in States outside of California. That extra territorial application is what causes the Commerce Clause problem, particularly when other States said, we don't have any objection to this at all. But Secretary Jones saying, we need to protect California's electoral interest is shutting down a website that doesn't affect California's electoral interest whatsoever. To the extent, then, that he overstepped the California interest, what could he have done with respect to the website that would not have run into the Commerce Clause problem? As long as the website didn't allow for California users to engage in those transactions, there's nothing he could have done. So that's – but – so as long as the website excluded California users. That's correct, with respect to the extra territorial application. That's correct. Was he apparent from the outset, or do we know that the Secretary of State knew that if you put in you were from California, it wouldn't work? I don't know whether he knew or not, Your Honor, but I think it's his obligation as a law enforcement official not to threaten action that violates constitutional provisions. There's not an intent, I'm sorry, Your Honor. No, I hear that, but I'm not – I'm not so sure that somebody in their position – this is all happening pretty rapidly in terms of the sites going up, and it was all in the few days before the election, and it was fairly late that this, even in the national political discussion, that the election was perceived to be as close as it was, and that vote-swapping might be an intelligent strategy. It's not apparent to me somebody looking at the website, unless, I guess, you signed on and started one of the transactions as you described it, they wouldn't know that it didn't work in California. Well, the evidence in the record is, Your Honor, and it's in Mr. Wood's declaration, I believe. I don't have the pages right in front of me. It's submitted that it was a very intense, fact-specific inquiry they made in order to determine which sites were okay and which weren't, and that they did go on and look very carefully at the sites. So the best evidence in the record is that they should have known. And in the – But you just described it. Unless you initiated one of the swaps, it wouldn't disclose to you that it doesn't work in certain states. But nonetheless, Your Honor, and appear to be dodging slightly that I don't believe I am, we have a claim for prospective relief, and the government has never suggested that they cannot in the future prohibit a website merely because they think it violates their conception of what the law should be, even if it has no effect on California voters. It's been fully briefed, and they've never suggested that their position is, oh, we're not going to bother with these sites if they don't allow California voters to be matched up. So with respect to the claim for prospective relief, as opposed to the damage, it doesn't, I don't think, really matter whether the Secretary knew at the time or not. He clearly knows now, and he's never disclaimed it. And why don't you basically issue an opinion that says that the Secretary of State can only shut down the website insofar as it affects California voters? With respect to the Commerce Clause, Your Honor, with respect to the First Amendment claim and the statutory construction claim, the answer is that the government can't do this, period. But with respect to the Commerce Clause, and if I may turn for just a minute. Now, you're saying that there is – okay. So backing up the chain, then, you're saying under the statute, that's because you don't think the statute consideration element reaches nonmonetary compensation? That's correct, Your Honor. So if the California legislature decides that the Secretary of State has a good point of view and amends the statute to extend the concept of consideration, if it hasn't already done so through state law, that that would then take care of the statutory problem, and then you're back to the First Amendment? That's correct. And the First Amendment would not – and the First Amendment would say, you can't stop this vote-swapping scheme, even as to Californians, because there's no compelling state interest. It is not narrowly tailored to satisfy compelling state interest. But you do agree, do you, or not? That's what I don't know. It's a little difficult sitting here trying to figure out where this thing goes. It almost seems like a legislative problem. But we'll deal with what we've got. And I'm just trying to find out the parameters of where you – I think this case goes. Would the California legislature be in a position to narrowly tailor it to address the concerns about fraud that might arise by fraudulent inducement of people to give up – Californians to give up their vote and not get the vote that they expected? Well, I think California already does that through their fraud statutes. And so – and that's what the Schomburg case says, basically. We don't silence the First Amendment when what the government can do to deal with fraud is use – rely on their fraud statutes. But laying this out, the First Amendment position is the government cannot do what they're trying to do. The statutory argument is that the statute does not prohibit this activity. The Commerce Clause argument is directed particularly to the extraterritorial reach of what Secretary Jones does. Your Honor, I got so engrossed in this that I went far over my time. You'll have some time on rebuttal. Let's hear from the State. Thank you, Your Honor. May it please the Court. My name is Zachary Morazzini, Deputy Attorney General, appearing on behalf of former Secretary of State Bill Jones and the current Secretary of State Deborah Bowen, in fact. Oh, right. Your Honors, Your Honor, this case is not about speech or association. It's about a state's ability to regulate conduct that threatens to corrupt and erode the integrity of the state's electoral process for the sole purpose of qualifying a third-party candidate for matching federal funds in the next presidential election. By operating computer database here in California that actually brokered votes between individuals, plaintiffs did, in fact, violate the election's code provisions. These databases directly match email addresses of individuals from other states, states which, in fact, could have included California. Page 53, footnote 9 of Appellant's Opening Brief concedes that given the lack of these websites' ability to verify end users' locations, it's almost impossible that California voters did not use voteswap2000.com. In fact, the record also shows that the other plaintiff involved in this case, voteexchange2000.com, actively considered California a swing state and actively included California in the vote swapping database. Now, there was, the issue in this case, again, is conduct, Your Honors. You had multiple questions regarding the actual workings of these websites, and it's my understanding that based on the record, the evidence shows individuals would log on, submit their information, including the state. And what, okay, and what were they communicating? They were communicating their preferred candidate, their preference in Ralph Nader and Al Gore, and the state of their residence. This information would go to the computer database, which was at all times located in California. The information would come into California. This database on voteswap2000, at least, would match up based on the preferred methods and the theories that the plaintiffs thought would provide the best results. The physical electronic conduct occurred in California. That's what Secretary Jones keyed in on. And if we look at the letter, the actual conduct at issue here, Secretary Jones narrowed his objections to solely this discrete, distinguishable aspect of plaintiff's website, this aspect that there was actual vote brokering going on with voteswap2000. And the letter speaks volumes, I think, Your Honors. If you look at the final paragraph, Secretary Jones, this is at the record page 081 through 087. The very last paragraph on page 0187, Secretary Jones says, quote, I demand you stop this activity immediately. At no time did Secretary Jones object to the speech or association aspects of these websites. Plaintiffs were free to discuss voting strategies. The record shows that Secretary Jones reviewed multiple other websites wherein strategic voting on behalf of third-party candidates was discussed. None of these other websites were objectionable to Secretary Jones. And there's only one reason for that. That's because voteswap2000 was the only website analyzed by Secretary Jones and his staff that they determined had this discrete, distinguishing conduct feature that actually conducted a vote swap here in California soil. So it was the matching mechanism that was the problem. The letter sent by Secretary Jones' office specifically identifies, I think if we look at the third full paragraph. Yes, I just read it. In fact, the plaintiffs here were the ones that voluntarily shut the entire thing down, right? Correct. Secretary Jones shut nothing down. They didn't have to do that. They never had to do that. It was only the vote brokering aspect of this website. And I think Judge Fischer pointed out that these websites were free to remain open afterwards, so long as they didn't do this transaction in California, which actually brokered these votes. Well, if the, is it appropriate for a California voter and a New Jersey voter, I don't even know if those are the right states, but to go on email, go on, you know, get into a chat room, for example, and say, hey, I, let's, you vote for Gore there, I'll vote for Nader here. Can they do that? I think the same analysis would apply, Your Honor. If we can find valuable consideration in this arrangement. So you're saying that it's illegal to, for, basically, then, your fundamental position, then it's illegal for individual voters to agree to vote swap. It may be a technical violation, but again, both. No, not technical. I mean, is it a violation or not? I mean, is it the kind of thing that you could go after somebody for engaging in a criminal conspiracy to corrupt the election process or whatever the statute is directed at? Sure. Your Honor, I think you keyed in on the key word and the key concept here is corruption. Both these election code provisions appear under Division 6 of the Elections Code, which is entitled Corruption of the Voting Process. That's a title, right. Sure. So I think we know that the fundamental purpose behind these two provisions is to prevent corruption of the electoral process. What's the corruption? What's wrong with that strategy? Perhaps two individuals communicating on their own would violate the technical language of the statute, but may not be found to corrupt the electoral process in California or- So you're just telling me that I can't agree to, with my family member, that, look, Gore's going to win here anyway. Sure, I'll be glad to vote for Nader if you decide to vote for Gore in your state, where it's a close election. Your brother in Florida. Or Florida, yeah. Well, who knew at the time? Your Honor, if there's valuable consideration- What's the, there's no consideration. Okay. If there's no consideration, there's no consideration. You're arguing that there is, just by entering into the agreement. I'm sorry, Your Honor. I was assuming that the elements of the language of the statute would have been- Well, let's do that. I'm, well, that's the statute you enforced here. So I'm trying to understand, is it the transaction or the enabling of the transaction? Secretary Jones focused on the enabling of this transaction because- And that's all. Exactly. Okay, so then the answer to my question is if, I think, tell me if I'm wrong, that if the websites continued and they did not enable, they simply set up a chat room and said, if any of you folks in your electoral college system or the, whatever it is, or the, you know, the spoiler role that Nader may play, we encourage you to go ahead and, you know, agree that you should swap votes. They're not brokering it. They're just advocating it and the people on the way in the chat room are saying, hey, that's a hell of a good idea. Let's do that.  So it's just because that would be, and if it did, would you concede that there's, at least now we're into the First Amendment? For purposes of the hypothetical, I would concede that, Your Honor. Okay, so bringing it back to the real case, what we did have here was a website that was clearly communicating on behalf of the website operator a political point of view about, be it the electoral college or the, you know, the spoiler, whatever, I mean, I didn't go back and look at the website, so I don't know, but it was communicating a point of view about the electoral process and coming up with a suggestion that people trade votes, right? Correct. And if that's all it did, you wouldn't be shutting down the website, presumably? I believe that would be true, Your Honor. Okay, and so now that they have taken the next step, you're saying, and they say, if you put in an application identifying yourself as an eligible vote swapper, we will match you with a interested vote swapper in Florida, okay? And that's where the, that's the target of the Secretary of State's action? Correct, Your Honor. Facilitating. And your argument is that that's just conduct? That is conduct. And you don't think, does it rise to the level of expressive conduct? Not for purposes of the analysis in this case, Your Honor. I think this is more analogous to what the Supreme Court recognized in Brown v. Hartledge, that although agreements to engage in unlawful conduct do contain an expressive element simply by verbalizing the agreement, the First Amendment is not trenched upon when the, and the government has the ability to prohibit such unlawful agreements. And the agreements are the conduct in that sense. There was the payment of money. There was a payment of money, but the court went beyond that in their analysis. And generally, these types of agreements, if it weren't in Brown v. Hartledge,  they were going to get it indirectly through a reduction maybe in their taxes because they wouldn't be paying. Correct. So Governor Schwarzenegger would have been in trouble if that case hadn't come out that way. Didn't he work for a dollar? Correct, Your Honor. Okay, well, in all seriousness now, then, so now this, now putting ourselves back in the Secretary of State's position who is trying to prevent, in generalization, corruption of the electoral process, he relies on a state statute, two state statutes. It doesn't rely on the fraud statute, correct? I believe that's true, Your Honor. Okay, so do we analyze this case strictly in terms of his authority under California law to do what he did under those two statutes? I don't think this court is limited in any sense if we're going to apply any tests down the road during the course of this oral argument. I don't think this court is limited to what the compelling governmental interests might be here. Preventing voter fraud, the Secretary felt, was sufficiently covered by application of these two election code provisions. But that wasn't invoked. That wasn't invoked in this case. The fraud statutes and the laws governing common law fraud weren't expressly articulated in Secretary Jones' letter. Well, see, the problem we have is a little, I don't know who this cuts against, but the problem we're confronted with is a fairly unique fact pattern, a statute that is rather ambiguous, at least in terms of what valuable consideration is. We have to, I think it looks like we would have to interpret California law, indeed, to get to where you want to. Correct? In other words, let me put it this way. This is what's at least bothering me. Why are we into the constitutional arena if the Secretary of State doesn't even have authority under California law under the two statutes he invoked to take the action he did? What if he is wrong that this constituted a violation of the valuable consideration statute? Well, Your Honor, early on, I believe in early 2000 during this case, the State convinced the district court, pardon me, the district court agreed to abstain in this matter given that this was an interpretation of State law. That was ultimately overturned by us, by this Court, Your Honor. Well, that was at the time, but that still doesn't mean that, that just said don't abstain from rendering an immediate decision because of the imminency and the importance of the question, but that doesn't mean that as a matter, now that we have it in more, in calmer times, that we shouldn't, is this a, for example, is this an issue we should certify to the California Supreme Court as to whether the Secretary of State had that authority? Perhaps, Your Honor. We did not brief that issue, but nevertheless, I believe it is a fundamental interpretation of California's law under California law, and if this Court were so inclined, I believe the Secretary of State's office would certainly have no objection. Okay. So what do you, what do you think is the decision we're supposed to come out with in this case, assuming we don't certify? Certainly, Your Honor. I believe the primary issue is whether or not these election code provisions apply. Whether or not valuable consideration We do have to decide that. I believe we, this Court does, Your Honor, in order to determine whether or not a He had authority to act. He had authority to act under California law. And determining that, that kind of brings me back then to the original question. I just want to understand where you are. Sure. If we were to conclude that, no, they didn't, you say somehow we have to go beyond and decide whether or not he could have acted under some other statute like an anti-fraud statute? I'm sorry, Your Honor. I didn't follow up on the statute. Assuming we concluded that we don't think that he invoked the correct statutes to do what he did as a matter of State law, are we supposed to then cast about to see whether or not the voter fraud statute would have given him backup authority? For purposes of the damages claim, I believe that would be legitimate, Your Honor. If notwithstanding the fact that this Court determines the election code provisions simply don't apply in this manner, I think it would, the Court should go on to conduct an analysis as to whether or not there was other inherent authority under which the Secretary of State could have acted in order to stop this, these corrupting practices. That's for the qualified immunity analysis. For the qualified immunity damages analysis, Your Honor. What's the premise of the damage action? Is this a 1983 action? Yes, Your Honor. Is acting beyond the authority of California law a basis for a 1983 action, or are we talking there about the violation of the First Amendment? They would be talking about the violation of the First Amendment, I believe, Your Honor, is how they suggest to me we may not have to address the, I mean, it may not be for us to decide whether the California provisions apply. I mean, we have to reach the constitutional question in any event, as I understand it, because that's what lies behind the damage action. Okay. I mean, I'm just trying to feel my way through here. If, even if we decide that the election code provisions should not be interpreted as the Secretary of State, Mr. Jones apparently understood them at the time, so that they shouldn't have threatened to prosecute, you've still got the First Amendment issue sitting there, because as I, and maybe this is a question better put to the plaintiffs, but as I understood their cause of action, it's not that he acted ultra vires under State law. That's not a Federal cause of action. We're here because of a 1983 claim based on the Constitution. Correct, Your Honor. If I've misstated our position on that, I'm sorry. Even if this Court were to find that the election's code does not apply for purposes of the damages claim, the First Amendment issue would still have to be addressed, and Saucy v. Katz would still have to be applied. We can't duck it, but we have to look down to the ultimate constitutional violation. Perhaps, Your Honor. Okay. Anything else you? We talk about fraud here. I want to make sure I understand what the reference to. Is that the reference to the possibility of somebody elsewhere trying to game the system and cause California voters to not get what they bargained for, that is, be fooled into voting for one candidate instead of another? Correct. Judge Fischer's evil Bush administration hypo. So when you say fraud, you're not referring to the vote swap operation as properly intended, that is, you're not saying that it's vote fraud for someone to affect the exchange with his brother in Florida, for example, where they're not fooling each other? Sure. That wouldn't be under our fraud prong, but that would be under our corruption prong. A form of corruption, you say. Integrity of the electoral. I just want to make sure I understood what the fraud argument was. So the fraud is specifically aimed at somebody being duped. Correct. The record demonstrates, with plenty of evidence, Your Honor, that there's simply no way for these website operators to determine whether or not, say, a felon living in Australia is posing as a soccer mom in Minnesota for purposes of swapping a vote. The potential for voter fraud was rampant here, and it's conceded. Again, footnote 9, page 53 of the appellant's opening brief. And on the extraterritorial application, was the Secretary of State concerned with an impact on other state's elections? The record doesn't demonstrate that, Your Honor. What the record does show is that the conduct at issue that was addressed by Secretary Jones was occurring right here in California, as if myself and my friend were sitting in a coffee shop discussing stealing a car in Nevada. It does not less make our conduct less unlawful. Let's get specific. Suppose someone's setting out to steal an election in Nevada, and they happen to do it on the California side of the line in Lake Tahoe. And, well, I like the restaurant better there, or whatever. Does California election law apply to that misconduct? Let's take a classic misconduct, a vote purchase. Can California apply its election code to prosecute that Nevada vote purchase? I would say absolutely, Your Honor, because the State has a compelling interest in protecting not only the integrity of its electoral process, but in ensuring that crimes are not committed within its boundaries, even if those crimes are later Is it a crime here? to steal an election? Well, to buy a vote in a Nevada election. Is that a California felony? This would be a matter of first impression for me, Your Honor. I could venture an answer, and I would say yes, it is. Just as stealing a car in Nevada, though the ultimate act isn't occurring in California, the State has no less of a compelling interest in ad initio preventing the illegal agreement, the illegal conduct. Suppose we switch it around. They decide to meet at one of the casinos, and they do a deal that buys a California vote. California law apply to that, even though the act takes place in Nevada? I think California law would apply to the ultimate crime. Which portion takes place in California? Somebody's buying a California election, a vote in a California election, but they're doing it at Harris in Nevada. I could understand, and there's a method to this madness, there really is. But I take it you would probably say that California is entitled to enforce its, excuse me, code on a vote purchase intended to affect a California election, even if the actual deal is made in Nevada, and you catch it before the vote is actually cast or something. Yes. So there's little doubt that California can police its elections. The other one strikes me as possibly harder, and I think it's the challenge being raised in the Dormant Commerce Clause. Does California, simply because the proprietors of Vote Swap 2000 happen to be in Los Angeles or, I guess, we don't know exactly, the letter is sent to the Web site because they don't know exactly where it is, but assume they're in California, does that give California a basis to say it has a legitimate interest? If they knew that it wasn't going to affect California because they tested it, and it turns out it doesn't work if you're in California, but does work if you're in Florida and New Jersey, you say that California and the Secretary of State still intended to preclude that because you thought the fact that they were geographically in California gave the California statute regulatory control over it. Correct. The conduct itself was a violation of the statute, that the ultimate actions were going to take place out of State in certain instances, does not tie the hands of California, Your Honor. I think the public policy implications in there go vastly beyond just the facts of this case, though it is a matter of first impression. Okay. Thank you. Thank you, Your Honors. I'll give you a couple minutes for a quick rebuttal. Thank you very much. Your Honor, your question, as I understood it earlier, about what if I did this with my brother-in-law over the telephone in Florida, what I understood the government to say was, well, it might be a technical violation, but in fact, what I thought they finally said was, well, we don't think that's a violation. The problem was matching people up in volume. That idea stands the First Amendment on its head. If what you and your brother-in-law are doing is protected political speech and association, the mere fact that a website makes more people able to do it, in fact, should be applauded, and it makes it more protected by the First Amendment than it is simply to say, well, it's fine if you do it in small numbers, but the minute you make lots of people able to do it or able to engage in this discussion, that's illegal. That position makes no sense whatsoever. And the heart of our position is, the problem here is not the promise. What you do with your brother-in-law, I keep using that, I have no idea what you and your brother-in-law's relationship is, but using that hypo, what promise you make with your brother-in-law. Kennedy, I don't think you and your brother-in-law are in the same party, I'll tell you that. Whatever promises you make with your brother-in-law that don't involve financial transactions are political speech and association. And the fact that these websites made it easier for other people, beyond their family members, to do this is not a First Amendment. And it would be inconsistent with the First Amendment to say that if a few people can do it, it's okay, it's protected, but when you allow more people to do it, it becomes illegal. It brings me back to my 527 hypo. What the government seems to be saying is it's okay if you do one-to-one voter turnout, but if you set up a website that allows you, Judge Clifton, to log on and get the names and addresses of people in Ohio so you can make your voter turnout efforts more effective, you can go beyond your local neighborhood where there maybe isn't a closed election, you can influence the Ohio senatorial election. That's brokering, and it's corruption. Of course it isn't. It's actually spreading the Internet, it's the promise of the Internet, to spread speech and communications to broader levels. It is not brokering and corrupt. For you to get information about a voter in Ohio or a voter in Pennsylvania that moveon.org or freerepublic.org or the Republican or Democratic Party believes  it, that is a clear First Amendment doctrine. Breyer, you get too passionate about the point. I do think, in fairness, counsel was saying that if there's no fraud involved or no valuable consideration or whatever, so I'm not sure you read him as ultimately conceding that vote swapping, per se, is not illegal, and I'm not sure that's what he conceded. But if he says that there's no consideration, his whole argument has been a vote for a vote is consideration or a promise of a vote for a vote is consideration. So my point is, I think, forgetting fraud for a minute, but their point, what I understood their position originally to be was, there is consideration, but then what I understood to be the case is that there is consideration. Alito, I didn't hear him walk away from that ultimately. Well, okay, Judge Fischer, but what I heard in your question, for all due respect to opposing counsel, in the end, it's you who make the decision. What I heard and understood your question to be was suggesting that there actually is absolutely nothing wrong for you to have that conversation in agreement with your brother-in-law. That is correct, I believe. There is no corrupting financial interest involved, and if it's okay for you and your brother-in-law, it's okay for me and somebody else to use the Internet to do it. And I think that that's what Brown v. Hartlidge and the campaign contribution limit cases stand for. That's the principle. Promises that involve pure financial benefit outside the political process may be restricted. Promises of mutual political benefit alone may not be restricted consistent with the First Amendment. If I may make one other point with respect to the statutory interpretation, it's not just consideration. It is other valuable consideration followed by four terms, money, gift, or loan. You must read other than the other. Breyer, we've read the brief. We know. Okay. And to the extent of the Court's ability to reach that, I believe the Court always has the ability to decide a case and say we don't need to grant an injunction on constitutional grounds because there is no basis under the statute for the Secretary of State to take the action that he took. So I believe that is within the Court's inherent authority. Thank you, Your Honors. Thank you both. It's a very interesting case. And it is submitted. And we'll turn to the last case on calendar.
judges: Fisher, Clifton, Martinez